[Cite as *Shawnee Ridge Hunting, L.L.C. v. LaRose*, 2026-Ohio-995.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

| | | |
|---|---|---|
| SHAWNEE RIDGE HUNTING, LLC, ET AL., | : | Case No. 25CA1215 |
| Plaintiffs-Appellees | : | |
| v. | : | <u>DECISION AND JUDGMENT ENTRY</u> |
| FRANK LAROSE, OHIO SECRETARY OF STATE, ET AL., | : | **RELEASED 3/19/2026** |
| Defendants-Appellants. | : | |

<u>APPEARANCES:</u>

Morgan Staric, Hallie Zarbakhsh, and Greta Raser, Assistant Attorneys General, Columbus, Ohio for Defendants-Appellants State of Ohio and Director of Ohio Department of Natural Resources Mary Mertz.

Brodi J. Conover and Jessica E. Bainbridge, Bricker Graydon LLP, Columbus, Ohio for Intervenors-Defendants-Appellants Ohio Pork Council, Heimerly Farms, Ltd., And Eagle Creek Farms LLC.[1]

Zachary C. Schaengold, Jarrod M. Mohler, and Charles E. Rust, Robbins, Kelly, Patterson & Tucker LPA, Cincinnati, Ohio, for Plaintiffs-Appellees.

Hess, J.

{¶1} State of Ohio and Ohio Department of Natural Resources Director Mary Mertz appeal the judgment of the Adams County Court of Common Pleas following a hearing for a preliminary and permanent injunction. The judgment granted Shawnee Ridge Hunting and Paul Richter a permanent injunction and found that amendments and new sections to R.C. 1531.01, 1533.01, 1533.731, 1533.75, and 1533.99 made by H.B. 503 were unconstitutional.

---

[1] Intervenors filed a notice of appeal, but did not file a brief or otherwise participate in the appeal.

{¶2} The State and Ohio Department of Natural Resources (ODNR) (collectively the "State") raise four assignments of error. They contend that (1) the plaintiffs-appellees lacked standing; (2) the trial court applied the wrong standards in granting the injunction; (3) the trial court erred as a matter of law on the merits because H.B. 503 is neither vague nor does it authorize a taking; and (4) the trial court should not have converted the preliminary injunction hearing into a permanent injunction hearing.

{¶3} We find: (1) the plaintiffs-appellees have standing to bring this action; (2) the trial court applied the correct standards but made an error in the written order that is properly corrected with a nunc pro tunc entry; (3) the trial court did not err when it found H.B. 503 unconstitutional under the vagueness doctrine and the takings clause; and (4) the trial court did not abuse its discretion when it converted the preliminary injunction hearing to a permanent injunction hearing. We overrule the State's assignments of error and sustain the trial court's judgment. We remand the cause for the appropriate nunc pro tunc entry.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶4} Shawnee Ridge and Paul Richter sought a declaratory judgment and injunctive relief against the State, ODNR, and others to have provisions of H.B. 503 enjoined and declared unconstitutional. Richter owns Shawnee Ridge, a several-hundred-acre wildlife hunting preserve in Adams County that hosts a collection of wild animals, including boars. Shawnee Ridge has been a family-owned business for over 50 years. The preserve grounds are surrounded by 9-gauge triple-galvanized wire fencing, topped with barbed wire, and ranging up to

12 feet high in certain areas. Shawnee Ridge provides 30,000 pounds of corn to the boars to supplement their foraging diet, which includes acorns. According to Richter, approximately 70 to 80 boars are hunted annually, the meat is processed, and it is considered "free-range" pork by the United States Department of Agriculture, meaning the boars have continuous, free access to the outdoors for more than 50% of their lives. More than 60% of Shawnee Ridge's business comes from hunting and processing the boars in the preserve.

{¶5} In December 2024, the Ohio General Assembly enacted H.B. 503 to take effect March 20, 2025. H.B. 503 was enacted "to prohibit certain activities regarding garbage-fed swine, feral swine, and wild boar and to revise a definition in the Agricultural Commodity Handlers Law." R.C. 1531.01 was amended to add a definition of "wild boar" or "feral swine" as meaning members of the suidae and tayassuidae family:

> (HHH) "Wild boar" or "feral swine" means either of the following:
>
> (1) Members of the family suidae, including both of the following:
>
> (a) Wild pig, wild hog, feral hog, and feral pig;
>
> (b) Old world swine, razorbacks, European wild boar, and Russian wild boar, and any hybrids or crossbreeds thereof;
>
> (2) Members of the family tayassuidae, including collared peccary and javelina, and any hybrids or crossbreeds of members of the family tayassuidae.

R.C. 1533.731 was amended to add subpart (B)(4) to ban the release of or hunting of wild boar or feral swine in a wild animal hunting preserve:

> (B)(4) No person shall knowingly release for hunting or hunt wild boar or feral swine in any wild animal hunting preserve in this state.

R.C. 1533.75 was added to prohibit the following:

> (A) No person shall knowingly do any of the following:
>
> (1) Import, transport, or possess live wild boar or feral swine;
>
> (2) Release wild boar or feral swine into the wild or expand the range of a wild boar or feral swine by introducing the wild boar or feral swine to a new location;
>
> (3) Allow a swine that is under the ownership or possession of the person to live in a feral state;
>
> (4) Except as otherwise provided in section 1533.751 of the Revised Code, hunt, trap, or kill a wild boar or feral swine or assist in the hunting, trapping, or killing of a wild boar or feral swine;
>
> (5) Profit from the releasing, hunting, trapping, or killing of wild boar or feral swine;
>
> (6) Fail to notify the division of wildlife in accordance with division (B) of section 1533.751 of the Revised Code.
>
> (B) No person shall purposely feed a wild boar or feral swine.

R.C. 1533.751 was added to require a person with knowledge of the presence of a wild boar or feral swine to notify the division of wildlife and, if it is on the person's property, permits the person to kill it if the person notifies the division of wildlife within 24 hours and properly handles and disposes of the carcass:

> (A) Except as provided in division rules, a person, including a property owner, tenant, or person responsible for a property's management, who knows or has reason to believe a wild boar or feral swine is present on private or public property shall notify the division of wildlife within twenty-four hours of the person so knowing or having reason to believe of the wild boar's or feral swine's presence.
>
> (B) Except as provided in division rules, a person or a person's agent who encounters wild boar or feral swine on property owned or leased by that person may immediately eradicate the wild boar or feral swine without a hunting license required under section 1533.10 of the Revised Code if the person or agent does both of the following:

(1) Notifies the division as soon as practicable, but not later than twenty-four hours after the eradication or attempted eradication of the wild boar or feral swine;

(2) Follows the instructions provided by the division including the handling, preservation for testing, and disposal of any wild boar or feral swine carcass.

{¶6} While there is no penalty imposed against persons who fail to report the presence of wild boar or feral swine to the department of wildlife as required in R.C. 1533.751(A), criminal penalties and costs of varying degrees are imposed for violations of the remaining provisions. R.C. 1533.99(C) was amended to make a violation of R.C. 1533.731(B)(4) (hunting in a wildlife preserve) a first-degree misdemeanor. R.C. 1533.99(H) was added to make a violation of R.C. 1533.75(A)(3)-(6) and (B) a first-degree misdemeanor and a violation of R.C. 1533.75(A)(1) and (2) a fifth-degree felony. The applicable revisions in R.C. 1533.99 are:

(C) Whoever violates . . . division (B) . . . (4) of section 1533.731 . . . is guilty of a misdemeanor of the first degree.

(F) Whoever violates any section of this chapter for which no penalty is otherwise provided is guilty of a misdemeanor of the fourth degree. This division does not apply to division (A) of section 1533.751 of the Revised Code.

(H) Except as otherwise provided in this division, whoever violates section 1533.75 of the Revised Code is guilty of a misdemeanor of the first degree. Whoever violates that section when the violation involves the importing or releasing of a wild boar or feral swine is guilty of a felony of the fifth degree. In addition to any other penalty, the court shall require any person who is convicted of or pleads guilty to a violation of that section to pay the costs incurred by any state or federal agency for the investigation, control, and eradication of wild boar or feral swine that resulted from the violation. Money paid to the division of wildlife shall be credited to the wildlife fund established under section 1531.17 of the Revised Code.

{¶7} Shawnee Ridge and Richter alleged that H.B. 503 was unconstitutional and sought a temporary, preliminary, and permanent injunction. They alleged that all pigs fall under the definition of wild boar or feral swine as set forth in R.C. 1531.01(HHH) because pigs from Europe and Asia are members of the suidae family and pigs from the Americas are members of the tayassuidae family. They alleged that H.B. 503 failed the rational-basis test because there is no rational relationship between the concern over feral pigs spreading disease against the outright ban on owning and/or killing pigs. Under the law as written, they contended that any individual with a pig (pet teacup pig or a zoo with a pig in a petting zoo), in addition to themselves and Ohio pig farmers are criminals by their mere ownership of pigs. In addition, H.B. 503 would permit a landlord to shoot and kill a tenant's pet teacup pig if the landlord notified the department of wildlife and disposed of the carcass properly. They alleged there is no rational relationship between H.B. 503 and the government's interest in solving Ohio's growing feral swine infestation problem.

{¶8} They also alleged that H.B. 503 fails to meet the strict-scrutiny test. Pigs are chattel and private property protected by the Ohio Constitution. The Ohio Constitution recognizes a fundamental right to property. They contend that when a law restricts the exercise of a fundamental right, strict scrutiny is applied to determine if the statute is narrowly tailored to serve a compelling state interest. They alleged that H.B. 503 is not narrowly tailored to serve the government interest in reducing the spread of feral swine and the diseases they spread.

{¶9}    They alleged that H.B. 503 is unconstitutionally vague because a person of reasonable intelligence cannot ascertain with certainty what behavior is prohibited or permitted by the new law. They contend that their possession of pigs is criminal, their hunting of pigs is criminal, Shawnee Ridge's profiting from the hunting of pigs is criminal, their feeding of pigs is criminal, and although the killing of pigs on personal property is generally permitted, their land is a wildlife hunting preserve and the killing of pigs on that land is more specifically prohibited under R.C. 1533.731(B)(4). In sum, they argued that there is nothing Shawnee Ridge or Richter can do to not commit crimes under H.B. 503.

{¶10}  Following a temporary restraining order hearing at which all parties were present, the trial court granted a temporary restraining order. The trial court found that the definition of wild boar or feral swine was so broad as to include all pigs:

> The Court finds the Plaintiffs are likely to prevail on the merits because the definition of "Wild boar" or "feral swine" contained in R.C. 1533.01(HHH) is defined to include the families suidae and tayassuidae which arguably encompasses all pigs. The Statute does not define what makes a pig wild or feral and does not except a certain genus or species of pig from its purview. Accordingly, this Court finds the Plaintiffs are likely to prevail on their arguments that [H.B. 503] creates a law that fails the rational basis test, is constitutionally vague, takes property without due process, and imposes criminal penalties without due process.

The trial court also found that under H.B. 503, the plaintiffs could incur up to $80,000 in criminal fines and 40 years incarceration for the possession of the 80 pigs currently on their preserve.

{¶11}  The plaintiffs filed an amended complaint to add the Adams County Sheriff. The Ohio Pork Council, Heimerly Farms, Ltd., and Eagle Creek Farms LLC

moved for and were granted permission to intervene as defendants. The preliminary injunction hearing was continued by joint agreement of the parties to allow the intervenors adequate time to prepare for the preliminary injunction hearing. The preliminary injunction hearing was held over a two-day period and the temporary restraining order was continued in place during that time.

{¶12} On the first day of the preliminary injunction hearing plaintiffs called Pavan Parikh, who served as chief legal counsel for the minority caucus and a policy advisor concerning the constitutionality and legality of different bills that process through the Ohio legislature. Parikh also served as legislative counsel for the Federal Home Loan Bank of Cincinnati where he worked on legislative matters in Ohio, Kentucky, Tennessee, and the federal government. Parikh testified that H.B. 503 was passed during a lame duck session, in which bills move "very, very quickly." Parikh testified that the definitional subsection (HHH), defining wild boar and feral swine does not follow "naming conventions and definitional structures" and adds "more ambiguity as to what the definition actually is." Parikh testified that the way the definition is written, it includes all members of the family Suidae and the family Tayassuidae, which essentially bans all pigs in Ohio. This would lead to non-uniform enforcement of the law because people could read the definition very differently.

{¶13} Paul Richter testified that he and his family have resided in Adams County for over 50 years and his father, Paul Richter, Sr., opened the Shawnee Ridge Hunting preserve in 1973.  Richter took over the business and now has two sons who assist him. Richter testified that the preserve is 237 acres of fenced land

with hogs, rams, goats, deer, and occasionally bison. There are 2 sections, one with twelve-foot fencing for deer and larger animals, and the other a five-and one-half-foot fenced section for boar and ram. The preserve has had boar since its inception in 1973. Richter testified that no animal has ever escaped over or under the fencing. However, in approximately 2020 a landslide occurred, and eight deer escaped. Richter fixed the fencing and notified ODNR of the escape. Richter regularly monitors the entire perimeter on a four-wheeler.

**{¶14}** Richter testified that he forgot to renew his ODNR license and sent in his application and renewal fees on March 20, 2025, which was received by ODNR on March 24, 2025.

**{¶15}** Richter testified that he has hybrid hogs, some which are born in the preserve and others that he obtains through exotic stock sales in Ohio. He has never purchased hogs from out of state or out of the country. After he purchases them, they are quarantined in a barn for two days before they are released. He feeds the animals in the preserve 200 lbs. of corn every 2 days at a cost of approximately $15,000 to $20,000 a year. Wild boar hunting is approximately 50% of the preserve's revenue. People engage in hunting wild boar because the meat is very good to eat and they like the challenge and camaraderie of hunting with friends and family. Approximately 75 to 80 percent of the preserve's new clients come to hunt pigs because of the superior taste of the meat.

**{¶16}** Richter testified that he became aware of H.B. 503 during June 2024 and contacted his Ohio senators to express his opposition and to offer to testify against the bill. However, nobody followed up with him. Richter had concerns about

the bill as enacted because it was so broad it affected every pig and every pork producer in the State of Ohio. He was concerned that because he owned a hunting preserve, he would be subject to criminal prosecution and jail for owning hogs that he has had for decades.

{¶17} Richter testified that he had witnessed a feral pig approximately three years ago when a representative from the U.S. Department of Agriculture approached him to warn him that they had trapped and tagged a feral sow and released it with a tracker in the hopes of locating two other feral pigs. The tracker broke and they lost track of the tagged feral sow. Richter was told to shoot it if he discovered it. Richter testified that he located the feral sow on trail camera footage from an adjacent property that is not fenced, and there were six or eight piglets with her. Richter saw the sow several months later without any piglets and was able to shoot the sow.

{¶18} Richter testified that several years ago at the request of the ODNR, he installed two one-way doors, which allows animals that have escaped to get back into the enclosure. Richter testified that he is aware of one occasion on which a pig escaped, and he was able to locate and shoot it. He repaired the area which had developed a sinkhole under the fencing and monitored the area and did not locate any other escaped pigs. He is not aware of how many pigs in total may have escaped from the preserve over the years, but it is a very rare occurrence.

{¶19} Dr. Andy Bowman, a professor in the Department of Veterinary Preventative Medicine at The Ohio State University, testified as a qualified expert

on pigs[2] and infections on behalf of the intervenors. Dr. Bowman testified that the Suidae family of pigs is a family that encompasses 18 different genus and species, "I think, in general, we would think those are all the different pigs of what we think of as normal pigs in the world." A domestic pig is in the family Suidae and the products in the grocery store, such as a pork chop, come from domestic pigs from the family Suidae. Dr. Bowman discussed the type of diseases that feral swine might carry that pose a risk to domesticated pigs. Dr. Bowman testified that he believed that H.B. 503 would reduce the risk of the spread of disease amongst the domestic pig population.

{¶20} Dr. Bowman testified that, to him, a feral pig is "any non-domesticated pig . . . pigs roaming the countryside." Ohio has had an ongoing problem with "uncontained pigs," particularly in the southern half of the state. The two main diseases (pseudorabies and brucellosis) feral pigs might transmit to domestic pigs are transmitted through direct contact. There is also an H5N1 influenza virus that is transmitted by wild birds to poultry, cattle, and pigs.

{¶21} On cross-examination, Dr. Bowman agreed that all pigs that Richter purchases for Shawnee Ridge must test negative for both pseudorabies and brucellosis prior to entering Ohio, under OAC 901-117.12. However, these same tests are not required for pigs that come into "every Smithfield factory." Dr. Bowman agreed that, on an individual basis, Richter's pigs undergo stricter testing and verifications for pseudorabies and brucellosis disease than the pigs that come into "the Smithfield factories." Dr. Bowman testified that a domestic pig will become

---

[2] Witnesses, attorneys, and the trial court used the terms "pig," "hog," and "swine" interchangeably throughout the proceedings.

feral if given the right circumstances. Dr. Bowman testified that male pigs will grow tusks and that every pig in the United States today is of the family Suidae:

> Q:  And you talked about the members of the family Suidae and that is, to be clear, every pig that's in the United States, correct?
>
> A: It is in the Family Suidae, yes. Yes.
>
> Q: Every pig that [Richter] owns, every pig that the Ohio Pork Council has some sort of governance or relationship over, they are in the Family Suidae, correct?
>
> A: Correct.
>
> * * *
>
> A: I think all pigs are a part of the Family Suidae, yes.

{¶22} Dr. Bowman testified that he performs research on the transmission of disease among pigs. Dr. Bowman's research includes the study of the transmission of respiratory illnesses among pigs at state agricultural fairs and shows, in which pigs from different geographic areas come together in close enclosures. Dr. Bowman established an influenza A virus ("IAV") monitoring program to monitor these pigs at agricultural fairs and found that 25% of fairs have pigs shedding IAV and at fairs where there were IAV positive pigs, 66% of all pigs tested positive by the end of the fairs, which include the 88 Ohio county fairs, plus 4-H events. Dr. Bowman testified that there is a risk of pigs transmitting IAV at county fairs and the pigs who travelled to these fairs can return to their farms and infect other pigs. Additionally, these IAV infected pigs could be sold at these fairs and put into different farms and infect that farm's pig breeding population. Despite these infection risks, Dr. Bowman would not advocate banning county fair and 4-H events.

{¶23} Dr. Bowman also researched the risks of feral pigs captured in Ohio from 2009 through 2015. His research concluded, "Results indicated an overall low prevalence of pathogens in feral swine in Ohio; however, the importation of live feral swine from other states remained an important concern for pathogen introduction and spread." Dr. Bowman also conceded that even though he wrote that Ohio's feral swine population "likely originated from hunting preserve escapees or from illegal interstate transportation," he had no citation for that information, and he agreed it was "word of mouth" and he had no evidence that Shawnee Ridge was the source of any feral swine in the study. Dr. Bowman's study also concluded, "From a public health standpoint, our results indicate feral swine pose a risk, albeit overall low, for zoonotic pathogen transmission in Ohio. The risk to the public is perhaps greatest for hunters, biologists[,] and other professionals who have close contact with these animals or those who consume their meat." Dr. Bowman testified that he continues to hold that opinion concerning feral swine in Ohio. Dr. Bowman's feral swine study concluded, "This study serves as an important step in recognizing feral swine risks in Ohio and assisting in prioritizing future surveillance, pathogen testing, and control strategies. Illegal introductions of animals carrying pathogens remain a critical threat to Ohio's swine industry." Dr. Bowman agreed that he had no evidence that Shawnee Ridge or Richter introduces animals illegally into Ohio.

{¶24} Dr. Bowman agreed that about 25% of his research is focused on disease transmission at fairs and there were only three of his studies related to

feral swine. Dr. Bowman agreed that he focuses his research on true risks to the pig population.

**{¶25}** On redirect, Dr. Bowman reiterated his belief that feral swine do pose a risk to the domestic pig population and that H.B. 503 is directed at limiting the feral swine and wild boar population. Although the reduction of disease is one aspect of the bill, Dr. Bowman believes the bill is also meant to reduce the crop damage feral swine can cause.

**{¶26}** On re-cross Dr. Bowman testified that he made a distinction between feral swine and the wild boar on an enclosed hunting preserve like Shawnee Ridge:

> Q: Dr. Bowman when you talked about feral pigs, you are talking about the unowned and just wild out there, not enclosed in a hunting preserve type of pig, right?
>
> A: Correct.
>
> Q: You're not talking about my client's [Richter's] pigs specifically, are you?
>
> A: I'm not.

**{¶27}** Dr. Bowman testified that if H.B. 503 outlawed the existence of all pigs, that would be an unreasonable approach to eliminate concerns about the spread of disease. In a question from the trial court, Dr. Bowman testified that there is no current law that requires all domestic hogs to be vaccinated for pseudorabies and/or brucellosis. There is no requirement for a pseudorabies vaccine because all 50 states have been recognized as free from pseudorabies in the domestic pig population.

**{¶28}** Cheryl Day, executive vice president of the Ohio Pork Council, testified that the Ohio Pork Council is a trade association that represents pig

farmers in Ohio. The Ohio Pork Council has 2,500 members representing 3,400 farms, with an economic value to the state of $3.8 billion, $115 million in state and local taxes, and 28,000 jobs.

**{¶29}** Day became involved in H.B. 503 because of concerns the United States and South American countries have with African swine fever, which has become a problem in Europe. South and North America do not have African swine fever in its pig population. Currently, 44 states ban the importation of feral swine and 16 states ban the hunting and importation of feral swine.

**{¶30}** Day testified that, in a hypothetical scenario where African swine fever was detected in the United States, there would be a 72-hour stop of all pig movement, hog prices would drop (Day speculates by 50 to 60%), and herds that were infected would have to be culled. U.S. trading partners would shut down the export market. To avoid the economic consequences of an African swine fever outbreak, the Ohio Pork Council works to keep foreign animal disease out of the United States by working on the U.S. Swine Health Improvement Plan which started a pilot project to have certain farms test for African swine fever.

**{¶31}** According to Day, H.B. 503 "gives us another tool in the strategy to control and eliminate feral swine in Ohio."

**{¶32}** On cross-examination, Day stated that she was not sure whether African swine fever was a respiratory illness, but that it is transmitted "nose-to-nose" or by the spread of manure from one farmer's boot to another farmer's boot and onto their farms. Day testified that African swine fever is not in Canada or any U.S. State such that the borders of Ohio are intact, and the transmission of African

swine fever is not coming to Ohio. However, Day testified that African swine fever can be transmitted in meat, and it is currently in the Dominican Republic. If someone from the Dominican Republic evades customs officials, brings raw infected pig meat in through the airport, and feeds that raw meat to an Ohio pig, the Ohio pig population could be infected with African swine fever. H.B. 503 addresses that through the garbage feeding restrictions in the bill. Day testified that any pig in Ohio is equally at risk for infection by African swine fever.

{¶33} Day testified that "food security is national security" and she agreed that a hostile government could sneak into a commercial farming operation in Ohio and feed African swine fever meat to the pigs, which are crammed tightly inside, and create an epidemic. However, Day testified that "farms have strict biosecurity reasons for that, and they limit the guests that come on, and they have to sign and do cameras, just as anybody would protect their property."

{¶34} Day testified that H.B. 503 was a law the Ohio Pork Council advocated for and "it was a group effort." "We all reviewed the language to our [sic] best of our knowledge, so we thought we had the language and definitions tight and correct." Day testified that she does not believe the entire Ohio pork industry could be wiped out by H.B. 503, "because I see the bill as a legislative attempt to only do feral swine."

{¶35} Following Day's testimony, the trial court continued the hearing in progress because they ran out of time for the State's witness. The temporary restraining order was continued in place through the next hearing date.

**{¶36}** The second day of the hearing, the State called Leighland Arehart, a law enforcement program administrator with the wildlife division of ODNR. Arehart's responsibilities include oversight of the records management system, development of policy and procedures, and drafting administrative rules. Arehart is familiar with wild animal hunting preserves and with H.B. 503. Arehart prepared a document summarizing the changes in H.B. 503. Arehart testified that the purpose of H.B. 503 was to eliminate feral swine and wild boar from Ohio because they pose a risk to native habitat, crops, agricultural commodities, and can transmit disease.

**{¶37}** Arehart testified that the Ohio Administrative Code Rule 1501:31-1-02 (FFFFFF) contains a definition of "wild boar" or "feral swine" that is similar to the one in H.B. 503 but is structurally different and has been in place since 2014. Arehart testified that he would determine whether a pig in the wild were a feral pig or a domestic pig by evaluating "the totality of the circumstances where it's found, its proximity to a known livestock operation, what it looks like, if it is acting wild, how far away it is, if we can determine when it escaped, those kind of things would all be for consideration." Arehart testified that there are four wild animal hunting preserves in Ohio licensed to have wild boar for hunting. These preserves obtain wild boar through a licensed breeder, an exotic animal sale, breed them themselves, or through natural breeding on the preserve. Wild animal hunting preserves are required to be licensed, fenced, and animals on the preserve must be tagged if they are released into the preserve (tagging existing animals in the preserve is not required). Arehart testified that he is aware of only one escape of

wild boar from Richter's Shawnee Ridge preserve and that was "years ago, a large tree fell and knocked down the fence. [Richter] knew three hogs got out, and he was able to shoot them down the road."

**{¶38}** On cross-examination, Arehart testified that the Department of Agriculture is responsible for livestock in the state and the Division of Wildlife would work with the Department of Agriculture to help delineate whether a pig would be called feral or domestic.

**{¶39}** Arehart testified that he prepared a letter to be sent March 20, 2025, the expected date of the effectiveness of H.B. 503, to inform hunting preserves with wild boar that what they were doing was illegal but that the Division of Wildlife would refrain from enforcing H.B. 503 until June 1, 2025. The Division of Wildlife was aware of the impact of H.B. 503 on wild boar hunting preserves since December 2024, but was not going to contact any of them until the law took effect and they were already acting illegally.

**{¶40}** Arehart agreed that if a pig escaped a local farm and got into Shawnee Ridge, it would be included in the definition of wild boar and regulated as an animal on a wild animal preserve. Arehart testified that prior to H.B. 503, the determination of what a feral pig is was left to the discretion of the Chief of the Division of Wildlife. Arehart testified that under R.C. 1533.75:

> If Mr. Richter had pens where he had livestock pigs, he was raising for the fair, whatever he does with them, they were contained in those pens and were not available for hunting in the preserve, they would be livestock. But if he's releasing them for hunting within the preserve, they would fall under the prohibition under 1533.731.

**{¶41}** To clarify the distinction between wild boar and feral pig, Arehart testified to the following:

Q: Mr. [Areh]art can we agree that wild boar, however you define them and domestic pigs, however you define them, can both become feral pigs or swine?

A: Yes.

Q: Okay. But they are not inherently feral pigs or swine until the circumstances arise that makes them feral pigs or swine, correct?

A: Correct.

Q: Okay. Now, you've talked about the totality of the circumstances, the color, are they owned, that kind of thing. And so, I was just trying to create that understanding, if we move the question along, we're just talking about feral swine. Mr. Richter's pigs, who for the record, have all had to be tested for Brucellosis and pseudorabies when he purchased them at stock sales in Ohio. They are more along the lines of wild boar than feral pigs, according to your totality of the circumstances test, correct?

A: So, his boar, wild boar, within his preserve, I would think would be wild boar. Correct.

**{¶42}** Arehart was then asked about the pigs that are advertised by the Wooly Pig Farm Brewery near Coshocton, Ohio. According to the advertisement by Wooly Pig Farm Brewery, they claim "Our wooly pigs are an old-world breed called 'Mangalitsas' originating in the Austro-Hungarian Empire in the late 1800s." It says the wooly pigs "are pasture pigs; they are excellent foragers and need very little feeding when free ranging in a pasture." Arehart testified that he would not consider the pigs at Wooly Pig Farm Brewery to be under ODNR's supervision even though, according to the advertisement, the brewery has hairy heritage-looking crossbreed pigs that are free-ranging in a pasture and foraging, because the advertisement said "that it is a domestic pig." However, Arehart clarified, "if this

exact pig were in the middle of Wayne National Forest, outside of captivity or confinement, or any livestock operation, then yes, it would be a feral pig." Arehart further clarified that if the Wooly Farm pigs "were within a hunting preserve release[d] for hunting, then they would fall under our regulations."

**{¶43}** However, upon further cross-examination, Arehart conceded that under the definition of wild boar and the totality of the circumstances test, the pigs on Wooly Farm could be wild boar:

> A: If I take this article to be accurate, it does appear to be a crossbreed of European wild boar and Serbian Sumadija breed, I'm not sure how to pronounce it, but they could potentially fall, yes, as a wild boar, or a crossbreed of a wild boar.

**{¶44}** Arehart testified that ODNR has not determined how they are going to regulate wild boar and feral swine going forward with the new definition. However, he testified that they had decided that they were going to send enforcement letters to everyone who listed wild boar on a wild animal hunting preserve within the last several years. He acknowledged that everyone understands that feral pigs are a potential problem and that feral pigs and wild boar are not necessarily the same thing. His approach to enforcing H.B. 503 was to begin with people who had wild boar, but not necessarily feral pigs. ODNR had not developed what the next enforcement step would be. Thus their first step was to start with wild animal hunting preserves. They had no plans to approach breweries with Hungarian boar crossbreeds. Arehart has not developed any guidance for his wildlife officers to tell the difference between a wild boar and a feral swine, even though there is a difference.

**{¶45}** Arehart testified that he believes Richter is the owner of the pigs on his land. However, the State of Ohio is the owner in trust of all wild animals not legally confined or held by private ownership. Arehart agreed that H.B. 503 makes the ownership and possession of wild boar unlawful, but it has no system set up to compensate people who owned wild boar before H.B. 503 went into effect.

**{¶46}** On re-direct Arehart testified that wild boar pose threats to landscape, habitat, agricultural commodities, and crops. But on re-cross, he conceded that those are threats that wild boar pose if they are living as feral pigs, wild on the landscape. And he agreed that this is the same threat, to a certain extent, that a domestic pig who becomes feral would pose to the landscape. Arehart testified that ODNR has a general understanding of the difference between domestic and wild animals and uses the Department of Agriculture definitions to aid them in interpretation and enforcement of their regulations and to ensure that they "are not overstepping into their lane."

**{¶47}** Arehart testified that H.B. 503 does not give the ODNR any specific waiting period within which to enforce the law. The agency's decision to wait until June 1, 2025 to begin enforcement was entirely discretionary.

**{¶48}** In response to questions from the trial court, Arehart testified that if a pig from the Wooly Pig Farm Brewery escaped to a neighbor's property, the neighbor could lawfully shoot it as feral swine. Similarly, if a Hampshire hog (black and white hog) escaped from a farm, it could likewise be shot as a feral swine.

**{¶49}** Paul Richter was called on rebuttal and testified that it was his father, Paul Richter, Sr., who spoke to the ODNR agents in 2021 about the escaped hogs.

Richter testified that he no longer purchases hogs from Canada, rather they are either propagated on the premises or purchased through exotic sales in Ohio. Richter also testified that he was seven or eight years old when the three hogs escaped as noted in the ODNR report, so it would have been in 1975 or 1976. Other than the three hogs, in the late 1970's a Sika deer escaped, a Spanish goat jumped out and was quickly shot, and in the mid-1980s a goat disappeared and may have jumped out or may have "met an untimely demise."

{¶50} Richter testified that he checks his fences often because the animals are his livelihood. It would be a bad business model if his profits were escaping, and Richter also does not want his animals impacting the environment. Richter testified that after 2021, there was a sinkhole that developed near a fence and a hog managed to get through, but Richter shot it. Richter testified that there are approximately 50 hogs on the preserve currently and he purchases approximately 30 to 40 hogs each year. The remaining 10 to 20 are naturally bred.

{¶51} At the conclusion of preliminary injunction hearing, Richter and Shawnee Ridge renewed their motion to have the court convert the preliminary injunction hearing to a permanent injunction and the State renewed its objection. The trial court granted the motion and converted it to a permanent injunction hearing. The parties gave closing arguments, and the trial court granted a permanent injunction to Richter and Shawnee Ridge on the grounds that H.B. 503 has ambiguous definitions and is void for vagueness and thus fails due process.

> If you apply this law, if this law goes into effect, you don't enjoin it, what does Mr. Richter do? There's nothing he can do based upon this law. What about the unambiguous parts? He can't sell, transport,

can't kill, can't feed, can't starve. What is he supposed to do with these animals?

The trial court found that Richter and Shawnee Ridge had proven both beyond a reasonable doubt and by clear and convincing evidence that the factors for a permanent injunction had been met. The trial court also found there is no remedy at law because, based on the approximately 40 hogs Richter owns, he could be charged with 40 misdemeanors, sentenced to 20 years of local incarceration, and issued a $40,000 fine.  The trial court clarified that the injunction did not affect the provisions of the bill that allow landowners to kill a feral pig or wild boar on their property, or the garbage-feeding provisions.

{¶52} In the order granting the permanent injunction the court found that Richter and Shawnee Ridge established their entitlement to a permanent injunction by clear and convincing evidence. First, it found that the definition of "wild boar" or "feral swine" includes the family of Suidae, which encompasses all pigs, hogs, and swine in Ohio. Thus, H.B. 503 authorizes the taking of all pigs, hogs, and swine in Ohio. As such it is "ill-conceived terminology that is overly broad/vague, and is unconstitutional." The amendments in R.C. 1531.01, 1533.01, 1533.731, 1533.75, and 1533.99 are void for vagueness and violate Richter and Shawnee Ridge's due process rights:

> Under these amendments and additions, Plaintiffs are unable to act without engaging in criminal activity: they cannot own, kill, transport, feed, or fail to feed the members of the family Suidae that they own, without committing misdemeanor or felony criminal acts. The Court also finds that the specific amendments and additions to Chapter 15 in H.B. 503 described above violate Article I, Section 19 of the Ohio Constitution as they would constitute an unjust and uncompensated taking.

In addition, the Court finds that the specific amendments and additions to Chapter 15 in H.B. 503 do not meet rational basis review. Feral pigs provide no benefit, but the Court cannot find that there is a rational basis connecting the prohibition on owning, killing, feeding, transporting or failing to feed any member of the family Suidae with the eliminating of feral pigs. The Court finds well beyond clear and convincing evidence that the specific amendments and additions to Chapter 15 in H.B. 503 are unconstitutional for the three reasons listed above.

**{¶53}** The order, entered April 11, 2025 stated, "This is a Final appealable Order and there is not Just Reason for Delay." The State and the intervenors filed timely notices of appeal. Richter and Shawnee Ridge had a separate statutory claim for attorney's fees under R.C. 2335.39 and 42 U.S.C. § 1983, §1988 in their complaint but requested that the deadline to file for attorney's fees be held in abeyance pending the appeal and the trial court granted that request.[3]

**{¶54}** After the trial court determined that the definition of "wild boar" or "feral swine" was so unartfully drafted as to include all pigs in the state, the Ohio General Assembly immediately acted to amend that definition. That amended definition was signed by the governor on June 30, 2025 – 11 weeks after the trial court's order. The revised definition of "wild board" or "feral swine" in R.C. 1531.01(HHH) is:

> (HHH) "Wild boar" or "feral swine" means a hog, boar, or pig that appears to be untamed, undomesticated, or in a wild state. "Wild boar" or "feral swine" includes both of the following:

---

[3] Richter and Shawnee Ridge's unresolved statutory claim for attorney's fees under R.C. 2335.39 does not prevent a final judgment; the order here is a final, appealable one. S*ee State ex rel. Staple v. State Emp. Relations Bd.*, 2025-Ohio-4698, ¶ 31. However, when attorney's fees are sought as part of damages and they are left unresolved, the order is not a final, appealable one because damages are part of a claim for relief, rather than a separate claim in and of themselves. *See Chilli Assoc. Ltd. Partnership v. Denti Restaurants Inc.*, 2022-Ohio-848, ¶ 26 (4th Dist.).

(1) Except for Sus scrofa domesticus that is legally confined or held in captivity, members of the family suidae, including all of the following:

(a) Wild pig, wild hog, feral hog, and feral pig;

(b) Old world swine, razorbacks, European wild boar, and Russian wild boar, and any hybrids or crossbreeds thereof;

(c) Wild pig, wild hog, feral hog, or feral pig that appear contained in a wild animal hunting preserve licensed under section 1533.721 of the Revised Code or a wholly enclosed preserve for hunting or trapping.

(2) Members of the family tayassuidae, including collared peccary and javelina, and any hybrids or crossbreeds of members of the family tayassuidae.

**{¶55}** The State argues that this change in the definition in R.C. 1531.01(HHH) moots a portion of their appeal, but not all of it. To the extent the trial court's analysis relied exclusively upon the former definition of wild boar or feral swine, the State argues that analysis is now moot. However, the State argues that certain portions of the trial court's decision did not rely exclusively on the former definition to reach its conclusions, and those portions are not moot. Specifically, the State argues that the takings and void-for-vagueness holdings are not moot, but the rational basis holding is moot.  Richter and Shawnee Ridge argue that even the rational basis holding is not moot because captive, free-range wild boar pose no greater threat to property and livestock than domestic pigs.

## II. ASSIGNMENTS OF ERROR

**{¶56}**  The State raises the following assignments of error:

1. The trial court erred as a matter of law when it granted a permanent injunction despite Plaintiffs' lack of standing. *Order* at 1.

2. The trial court erred as a matter of law when it applied the incorrect standards. *Order* at 2, 3.

3. The trial court erred as a matter of law when it found for Plaintiffs on the merits. *Order* at 1.

4. The trial court erred as a matter of law when it converted the preliminary injunction into a permanent injunction. *Order* at 1.

We address the State's first, second, and fourth assignments of error first and then turn to the third assignment of error – the merits of the trial court's decision.

### III. LEGAL ANALYSIS

### A. Standing

**{¶57}** The State contends that Richter and Shawnee Ridge did not have standing to challenge certain provisions in H.B. 503 because, even though they operate a wild animal hunting preserve that identified wild boar on their permit application, their license lapsed in April 2024 and they did not renew it until March 2025. Richter testified that his family had operated Shawnee Ridge as a wild animal hunting preserve since the early 1970's, when he was a young child. The family business is now operated by Richter and his two sons. However, he forgot to renew the license and sent in his renewal application and fees on March 20, 2025 and it was received by ODNR on March 24, 2025.

**{¶58}** Richter argues that there is no dispute that Richter and Shawnee Ridge own the pigs within the preserve and this alone gives them standing. Additionally, the relevant hunting preserve licensure statutes have two requirements: R.C. 1533.721(A) and (G)(1). R.C. 1533.721(A)(1) governs the initial license and requires the payment of a $1,000 fee. Subpart (G)(1) contains the annual renewal requirement and payment of $200. The renewal is to be made

on the thirteenth day of April each year. The statute imposes no fees or penalties for late renewal. Thus, Richter argues he was a license holder under R.C. 1533.721(A) and renewed it late under subpart (G). Therefore, he had standing to challenge the law.

### 1. Standard of Review

**{¶59}** "Standing determines whether a litigant is entitled to have a court determine the merits of the issues presented." (Citations omitted.) *Moore v. Middletown*, 2012-Ohio-3897, ¶ 20. Standing is a question of law, which we review de novo. *Id.*

**{¶60}** Before a court can consider the merits of a legal claim, "the person or entity seeking relief must establish standing to sue." *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 2007-Ohio-5024, ¶ 27. Under common-law standing, a plaintiff must demonstrate: (1) an injury; (2) that is fairly traceable to the defendant's allegedly unlawful conduct; and (3) is likely to be redressed by the requested relief. *Ohioans for Concealed Carry, Inc. v. Columbus,* 2020-Ohio-6724, ¶ 12. "[T]he question of standing depends upon whether the party has alleged such a 'personal stake in the outcome of the controversy,' as to ensure that 'the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.' " (Citations omitted.) *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972). "[J]udges are cautioned to remember, standing is not a technical rule intended to keep aggrieved parties out of court. ' "Rather, it is a practical concept designed to insure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial

decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." ' " *Moore* at ¶ 47; *Hoover v. Pfeifer*, 2025-Ohio-4909, ¶ 86-87 (3d Dist.).

## 2. Legal Analysis

**{¶61}** The State raised the issue of standing in its memorandum opposing the temporary restraining order and argued that the plaintiffs could not show any harm because they are currently operating an unlicensed wild animal hunting preserve because they did not submit their annual renewal application in a timely manner. The State argued that the plaintiffs had no separate right to own wild boar, however they cited nothing to support that contention and the exhibits they submitted acknowledged that because of H.B. 503, "Wild boar and feral swine can no longer be possessed in Ohio" – not that possession of them had been outlawed prior to H.B 503.

**{¶62}** Richter and Shawnee Ridge addressed the renewal application at the temporary restraining order hearing, explaining that "there has been a ministerial mix up in terms of the renewal of the license."

**{¶63}** The trial court does not directly address the State's standing argument in its order granting the temporary restraining order. Rather, it implicitly rejected the State's standing argument by finding that Richter and Shawnee Ridge were likely to prevail on the merits and that there was a substantial risk of irreparable harm because they run the risk of incurring up to $80,000 in fines and 40 years in jail for possession of 80 pigs, if the sentences were to be imposed consecutively. Remarks made from the bench during the temporary restraining

order reveal that the trial court found no merit to the State's standing argument such that it did not warrant more than a terse analysis. The trial court characterized Richter as "inadvertently overlooking maybe a renewal of a license application" rather than intending a purposeful surrender of the business or permanent cessation of operations. Additionally, the trial court found, "But when we talk about the broad sweeping [sic] that Mr. Richter doesn't have standing. This is his life." "[H]e's [Richter's] part of the pork industry. In that respect, that he does have apparently about 80 hogs that are harvested in a year's time." "And it's also been the livelihood of Mr. Richter and his family for over 50 years."

{¶64} We find that Richter and Shawnee Ridge have standing to challenge H.B. 503, both as the operator of a wild animal hunting preserve and as owners of pigs. The temporary lapse of the license does not affect their standing. There is no evidence that Richter intended to cease business operations. To the contrary, Richter had a family-operated business for 50 years and planned to continue it for his two sons. Moreover, there is no evidence that the temporary lapse of his license had any legal ramifications to the business. When he did renew the license in March 2025, he did not have to pay late fees, penalties, or reapply anew and pay the initial $1,000 license fee. The State has presented no evidence that they required Richter to suspend the ongoing operations of the hunting preserve during the time his license was lapsed. In fact, the only action the State ever took against Richter for his inadvertent failure to renew the license was to give him a reminder to renew it. The State explained that Richter had forgotten to renew the license on

another occasion in the past and the State simply gave him a reminder: "He has in the past also failed to renew his license and the agency informed him of this."

**{¶65}** The State has cited no case law or statutory authority that the license lapse removed Richter and Shawnee Ridge's standing to sue. Nowhere do we find the State claiming that H.B. 503 does not apply to Richter and Shawnee Ridge, nor does the State refute the trial court's finding the Richter and Shawnee Ridge could be fined up to $80,000 and jailed for 40 years (assuming 80 hogs) based on the criminal penalty provisions added by the bill. Richter and Shawnee Ridge have demonstrated an injury fairly traceable to H.B. 503 that is redressed by an injunction. They have standing. To interpret standing as the State argues it is to use standing as a technical rule to keep Richter and Shawnee Ridge out of court.

**{¶66}** We overrule the State's first assignment of error.

B. The Standards Applied by the Trial Court in Granting the Permanent Injunction

**{¶68}** The State contends that the trial court made two errors in applying legal standards. First, the State argues that Richter and Shawnee Ridge were required to prove that H.B. 503 was unconstitutional "beyond a reasonable doubt" but that the standard the trial court applied was "clear and convincing evidence." However, the State did not make this argument below. To the contrary, the State argued in their memorandum contra, "Plaintiffs have the burden to prove each of these factors by clear and convincing evidence." In addressing the constitutionality factor, the State did not argue a different standard of proof or argue that "proof beyond a reasonable doubt" was the evidentiary standard that applied to that factor.  Thus, to the extent the trial court erred, it was an error the State invited and

about which it cannot now complain. *Krista v. Thompson*, 2025-Ohio-5566, ¶ 33 (4th Dist.) ("Under the invited-error doctrine, a party may not take advantage of an error that he himself invited or induced the trial court to make.").

**{¶69}** Furthermore, Richter and Shawnee Ridge argued, and it was conceded at oral argument, that the trial court used the correct legal standard verbally from the bench at the hearing, but did not use the correct legal standard in the subsequent written order.

**{¶70}** The degree of proof required for a facial constitutional challenge like the one here is proof beyond a reasonable doubt. "To prevail on a facial constitutional challenge, the challenger must prove the constitutional defect, using the highest standard of proof, which is also used in criminal cases, proof beyond a reasonable doubt." *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 2006-Ohio-5512, ¶ 21. "To prevail on a constitutional challenge to the statute as applied, the challenger must present clear and convincing evidence of the statute's constitutional defect." *Id.*

**{¶71}** Our review of the hearing transcript confirms that the trial court found that Richter and Shawnee Ridge had proven both beyond a reasonable doubt and by clear and convincing evidence that the factors for a permanent injunction had been met: "The court, in returning to the factors, by clear and convincing evidence, I would go as far as to say, because I am, that it's beyond a reasonable doubt to this court." Because the trial court actually applied the "beyond a reasonable doubt" standard and found it had been met, any error in the trial court's subsequent written order can be corrected on remand with a nunc pro tunc entry. *Stepp v. Starett*,

2019-Ohio-4707, ¶ 9 (4th Dist.) (nunc pro tunc entries are used to reflect what the court actually decided and to correct clerical or mechanical errors).

{¶72} Second, the State argues that to grant a permanent injunction, the trial court should consider four factors (likelihood of prevailing on the merits; irreparable injury to plaintiff; no unjustifiable harm to third parties; and it is in service of the public interest). However, here the trial court added two more requirements: whether plaintiffs had an adequate remedy at law and whether injunctive relief is for the purpose of maintaining the status quo pending a trial on the merits.

{¶73} We find that the State has made no argument or showing that it was prejudiced by this purported error. *Smith v. Flesher*, 12 Ohio St.2d 107, 110 (1967) ("It is an elementary proposition of law that an appellant, in order to secure reversal of a judgment against him, must not only show some error but must also show that that error was prejudicial to him."). Moreover, the State has no standing to assert a purported error that placed additional legal burdens upon its opponent. "Generally, an appellant does not have standing to argue issues affecting another person." *Tunnacliffe v. Carr*, 2025-Ohio-5590, ¶ 76 (4th Dist.).

{¶74} Because any error in the burden of proof can be corrected by a nunc pro tunc entry and the additional standards imposed upon plaintiffs were not prejudicial to the State, we overrule the State's second assignment of error.

C. Conversion from a Preliminary to a Permanent Injunction Hearing

{¶75} The State argues that the trial court erred when in converted the preliminary injunction hearing to a permanent injunction hearing. The State argues that this was highly prejudicial to it because it wanted to determine if it could call a

witness to talk about "studies out there that the State recently become aware of" that discuss "the correlation between the number of feral swine surrounding areas that have wild animal hunting preserves." "There are studies out there focusing on these issues." Because the State could not present a witness to discuss these studies, it claims it was prejudiced by the conversion.

### 1. Standard of Review

**{¶76}** Under Civ.R. 65(B), "the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application" before or after the commencement of the preliminary injunction hearing. We review its decision to do so for an abuse of discretion. *West v. Cincinnati*, 2024-Ohio-1951, ¶ 15 (1st Dist.). An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. *Cochran v. Cochran*, 2025-Ohio-2565, ¶ 27 (4th Dist.).

### 2. Legal Analysis

**{¶77}** There are three types of injunctions:

> In Ohio, injunctions are separated into three categories: (1) the temporary restraining order, which is issued ex parte without notice in an emergency situation to last only until a hearing can be set; (2) the preliminary injunction issued with notice and after a hearing to maintain the status quo until there can be a full trial on the merits; and, (3) the permanent injunction issued after a trial on the merits. 2 McCormac, Anderson's Ohio Civil Practice (1991) 842, Section 75.01.

*Bd. of Educ. Ironton City Schools v. Ohio Dept. of Educ.*, 1993 WL 256320, *2 (4th Dist. June 29, 1993) (trial court erred when it consolidated a temporary restraining order hearing with a trial on the merits). Civ.R. 65(B) governs preliminary injunctions and provides, in relevant part:

(B) Preliminary Injunction (1) *Notice*. No preliminary injunction shall be issued without reasonable notice to the adverse party. The application for preliminary injunction may be included in the complaint or may be made by motion.

(2) *Consolidation of Hearing With Trial on Merits*. Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.

**{¶78}** Thus, under Civ.R. 65, a trial court has the discretion to consolidate a hearing on a preliminary injunction with a trial on the merits to prevent two hearings and save time and expense for the court and parties. *See* Staff Note, Civ.R. 65. The consolidation can occur after the preliminary hearing begins. Generally, it is improper for a trial court to consolidate a preliminary injunction hearing with the permanent injunction hearing (or a trial on the merits) without first giving notice to the parties. *Ohioans for Concealed Carry v. City of Columbus,* 2019-Ohio-3105, ¶ 49 (10th Dist.) (trial court erred when it did not give notice that it was consolidating the hearings until it issued its written injunction order).

**{¶79}** However, to be entitled to reversal, a party must not merely demonstrate it was denied proper notice, but also that the denial of notice was prejudicial. *Id*. at ¶ 52; *West v. Cincinnati*, 2024-Ohio 1951, ¶ 17 (1st Dist.) ("court does not abuse its discretion by consolidating the trial into the preliminary hearing without notice if the parties did not suffer prejudice from this maneuver"). A party who claims to be aggrieved by lack of notice of consolidation "should at least make a proffer to the trial court to highlight what evidence it would have introduced with adequate notice. Otherwise, we are left with little more than speculation on

appeal." *West* at ¶ 18 (city failed to show prejudice when it failed to proffer evidence to trial court that it claims it would have introduced with adequate notice).

**{¶80}** Here the trial court held a temporary restraining order hearing with notice to the parties. The State defendants had four attorneys representing them at the temporary restraining order hearing. Therefore, the trial court could have treated the motion for a temporary restraining order as one for a preliminary injunction but did not. *Bd. of Educ. Ironton City Schools v. Ohio Dept. of Educ.*, 1993 WL 256320, *2 (4th Dist. June 29, 1993) (where all parties have notice, are present, and participate, the temporary restraining order hearing can be treated as a preliminary injunction hearing).

**{¶81}** The trial court held a preliminary injunction hearing two weeks later on April 1, 2025, which extended to a second day on April 8, 2025. By the time the preliminary injunction hearing commenced the intervening defendants had joined and were represented by counsel at the hearing and had brought their own expert witness and a representative of the Ohio Pork Council to testify. Richter testified and had an expert witness also testify. The State defendants brought one witness to testify. Prior to the beginning of the first day of the hearing, Richter and Shawnee Ridge's counsel requested that the preliminary injunction hearing be converted to a permanent injunction hearing. Counsel explained:

> I was talking with [intervenor's counsel] and [State's counsel], and we have a lot of witnesses here. I don't know that we can call any other witnesses. If Your Honor is willing to consider the option to notify us, which I think all is required under Rule 65, and you're considering it, we'd like you to consider this for both Preliminary and Permanent Injunction. We are going to have I think everybody's due process rights will be taken care of with the number of witnesses we

have. . . . I think [opposing counsels] are at least hesitantly comfortable with that.

However, State's counsel disagreed:

Given the time frame that we do have, I believe the State may be seeking to have additional testimony in front of the court in terms of a Permanent Injunction. Additionally, . . . there is a right to appeal, . . . a Preliminary Injunction ruling for matters that stays laws. So we don't believe that there's a need to convert this into a Permanent Injunction hearing today.

The trial court denied the request to convert it, "we will not be converting this to permanent today, on permanent injunction." Due to time constraints, the State was unable to present its witness during the first day of the hearing, so the trial court continued the hearing until a week later.

{¶82} Prior to the start of the second day of the preliminary hearing, Richter and Shawnee Ridge's counsel renewed their motion to have the hearing converted to a permanent injunction. Relevant arguments concerning the conversion were:

[Plaintiffs' Counsel]: We would like to renew our motion to have this converted to a permanent injunction. All of the witnesses, all the evidence we're going to need here will have been heard by the end of today. My understanding is that [intervenor's counsel], on behalf of the interveners, does not oppose that. I'll let him speak for himself, But [State's counsel] does. I do not know [her] position as to why. But we believe, at this point, it makes sense for Your Honor to be able to make a ruling that establishes the parties' relationship, because I don't think we need more evidentiary hearings on this particular matter[.]
          *                *              *
[State's Counsel]: Yes, my colleague is correct. We do oppose the conversion to a permanent injunction hearing. The State would like to reserve the right to call additional witnesses as time progresses. As we're all aware, this has been a fairly tight time frame just given the procedural nature that we're in. So, we would request that this remain a preliminary injunction hearing so that the State has the ability and reserves the right to call additional witnesses should a

permanent injunction or when a permanent injunction hearing occurs.

        *                *                *

[Intervenors' Counsel]: I don't really have a super strong opinion about it. I think there's wisdom in converting it. I think there's wisdom in leaving it as a preliminary. I don't have a super strong opinion . . . .

        *                *                *

[Sheriff's Counsel]: We'll leave it to the court's discretion, Your Honor.

        *                *                *

[Plaintiffs' Counsel]: Your Honor, I appreciate the opportunity to quickly respond. You know, more witnesses was the reason that the State said, well, we don't want to do now. The State's had opportunity. We don't even understand what the State thinks might be an unresolved issue or might need to be developed as far as House Bill 503 goes. And I think that's telling. The State had the opportunity to bring more witnesses today. My understanding is they're not. And that was after last week when the State said, well, we don't want to convert this to a permanent hearing because we think there may be more witnesses. They've had their opportunity over the last week to figure that out. Our case is pretty much done. I'm not sure what else. And I don't think the State has enunciated what other evidence might be adduced from any mystery speculative witnesses. And I think that's telling. So, unless the State can particularly point to an area that they believe is lacking, that they believe truly needs to be developed, that they could have developed, that they could not have developed, I apologize. But I think it makes sense to convert this to a permanent injunction, Your Honor.

Plaintiffs' Counsel summarized the factors for an injunction and how each

of the witnesses and evidence addressed those factors and concluded:

[Plaintiffs' Counsel]: I just don't know what evidence there is left to figure out. And I think the fact that we have no new witnesses from last week to this week.

Court: I think there is an additional witness that has not been presented yet. At least one, correct?

[Plaintiffs' Counsel]: Yeah, but the State literally said last week, we don't think it's appropriate because we might need more witnesses.

Court: I agree. That was my hesitation.

[Plaintiffs' Counsel]: Yes. They've had the opportunity. They have no more witnesses. If they wanted to have more witnesses, I would have said, that's fine. Let's get the evidence in there so that Your Honor can decide what the law is and how it should be applied.

Court: Do you see any prejudicial effect to the plaintiff or plaintiffs if the court hears testimony before it determines whether this will be converted prior to closing arguments to a permanent injunction relief hearing?

[Plaintiffs' Counsel]: Your Honor, I do think having to continue to do this and continue to fight this over the long time period would be prejudicial to the plaintiffs. But if the court hears testimony before it decides.

Court: Today.

[Plaintiffs' Counsel]: Today. I don't that that's prejudicial. My big concern is I don't want the State to then say, well, you didn't give us sufficient notice. So, as long as everybody's on notice that the court may convert this, I'm comfortable with that.

Court: So, I'll reserve ruling on that, and I'll defer to [State's counsel]. She's not had an opportunity to present her client's testimony or persons that she wishes to testify. So, I'm gonna reserve it, but there'll be a ruling on it prior to oral arguments, okay?

Nobody objected to the court's notice that it would wait until the conclusion of the evidence to decide whether to convert the hearing to a permanent injunction hearing.

**{¶83}** After the State's witness concluded his testimony, the trial court asked the State if it had any additional witnesses that it would like to call and the State replied, "No additional witnesses from the State, Your Honor." The intervenors and the sheriff also stated that they had no more witnesses. Richter testified in rebuttal and at the conclusion of the evidence, the trial court addressed the conversion motion.

**{¶84}** The State continued to object to a conversion to a permanent injunction hearing on the ground that an additional witness might be found to discuss "the correlation between the number of feral swine surrounding areas that have wild animal hunting preserves." The State also addressed the issue of whether the order, if it were preliminary rather than permanent, would be a final appealable order. The trial court and other counsel also joined in to speculate about whether a preliminary injunction order would be a final, appealable order and whether the conversion to a permanent injunction would facilitate the parties' ability to appeal it.[4] The intervenors' counsel stated that he would favor converting it to a permanent injunction hearing. The trial court granted the motion and converted the hearing to a permanent injunction hearing and then allowed the parties to proceed with closing arguments.

**{¶85}** The trial court did not act unreasonable, arbitrary, or unconscionable when it converted the preliminary hearing to a permanent hearing. We further find that the State has failed to show prejudice from the consolidation. Here, the State was put on advance notice that the plaintiffs sought to have the matter consolidated at the beginning of the first day of the preliminary injunction hearing. The trial court further notified the parties on the second day of the hearing, which occurred a week later, that it would consider consolidation after it heard from the

---

[4] There is no legal landscape more littered with landmines than that of finality under R.C. 2505.02. *Compare Preterm-Cleveland v. Yost*, 2022-Ohio-4540, ¶ 28 (1st Dist.) (a preliminary injunction order enjoining a statute was not a final, appealable order) *with Cincinnati v. State*, 2024-Ohio-2425, ¶ 16-17 (1st Dist.) (a preliminary injunction order enjoining a statute was a final, appealable order). R.C. 2505.02 was amended October 24, 2024 to add (B)(8): An order restraining or restricting enforcement, whether on a temporary, preliminary, or permanent basis, in whole or in part, facially or as applied, of any state statute or regulation, including, but not limited to, orders in the form of injunctions, declaratory judgments, or writs; . . .

State's witness. The State's only objection to consolidation was that it might bring in a witness to discuss studies that correlate feral swine's presence with the presence of wild animal hunting preserves.  But it never proffered copies of those studies as evidence before the trial court. A party in the State's position "aggrieved by consolidation like this should at least make a proffer to the trial court to highlight what evidence it would have introduced with adequate notice. Otherwise, we are left with little more than speculation on appeal." *West v. Cincinnati*, 2024-Ohio-1951, ¶ 18 (1st Dist.).

**{¶86}** The State also argues that the trial court should not have consolidated the hearing because it had not yet filed an answer, citing *Hershhorn v. Viereck*, 27 Ohio App.3d 242 (10th Dist. 1985). We find *Hershhorn* distinguishable. In *Hershhorn*, the trial court consolidated a preliminary injunction hearing with a trial on the merits where the complaint asserted multiple claims, including breach of contract and specific performance. The appellate court found that it was prejudicial to the defendants to have to defend against all the claims raised in the complaint, particularly where the defendants had not filed an answer that might have raised additional issues. *Id.* at 243.

**{¶87}**  Here, Richter and Shawnee Ridge's complaint made three claims: a declaratory judgment that H.B. 503 is unconstitutional; an injunction against H.B. 503; and attorney's fees under R.C. 2335.39 and 42 U.S.C. § 1983, §1988. The declaratory judgment and injunction claims were intertwined, involving the same issues. Unlike in *Hershhorn,* the trial court here did not consolidate the preliminary injunction hearing with a trial on the merits of all claims raised in the complaint; it

consolidated it with a permanent injunction hearing. The State was not forced to defend the attorney's fee claim. And, the State does not identify any prejudice, nor does it contend that there were additional issues raised in its answer that should have been considered outside the scope of the hearing. To the contrary, the State's answer responded to the allegations in the complaint and raised a standard list of affirmative defenses. In sum, the State has failed to identify any manner of prejudice caused it by the consolidation of the preliminary and permanent hearings prior to filing its answer.

**{¶88}** We overrule the State's fourth assignment of error.

### D. The Trial Court's Findings on the Merits

**{¶89}** The State challenges two aspects of the trial court's decision to grant injunctive relief. First, it argues that H.B. 503 is not void for vagueness because it is clear what wild animal hunting preserves can and cannot do under the law and "opportunities for compliance are plentiful." Second, the State contends that the trial court erred in finding H.B. 503 authorizes a taking because Ohio citizens have no entitlement to own certain breeds of pigs. Alternatively, the State argues that even if it were a taking, an injunction is not the solution. Instead, a mandamus action is the correct legal procedure.

**{¶90}** Richter and Shawnee Ridge contend that the trial court correctly enjoined the statute because it failed the rational-basis test, is unconstitutionally vague and deprives them of due process, and is an unconstitutional taking of property. They argue that there is no rational basis for targeting hunting preserves and owners and propagators of wild boars because the evidence showed that this

breed of pig is less likely to spread disease than factory-farmed pigs. They argue that H.B. 503 is unconstitutionally vague because it is unclear what they can do without incurring criminal sanctions. Finally, they argue that H.B. 503 is an unconstitutional taking because all of their pigs would become property of the ODNR without compensating them for the value of the pigs.

### 1. Standard of Review

{¶91} "The grant or denial of an injunction is solely within the trial court's discretion and, therefore, a reviewing court should not disturb the judgment of the trial court absent a showing of a clear abuse of discretion." *Garono v. State*, 37 Ohio St.3d 171, 173 (1988), citing *Perkins v. Village of Quaker City*, 165 Ohio St. 120, 125 (1956) ("unless there is a plain abuse of discretion on the part of trial courts, in granting or refusing injunctions, reviewing courts will not disturb such judgments"). To review the trial court's grant of the permanent injunction, we must determine whether the trial court abused its discretion in determining that Richter and Shawnee Ridge proved beyond a reasonable doubt that H.B. 503 is unconstitutional.

{¶92} "[B]ecause the determination of a statute's constitutionality presents a question of law, we review the merits of that question on a de novo basis." *Hayslip v. Hanshaw*, 2016-Ohio-3339, ¶ 27 (4th Dist.). Moreover, "[w]hen a claim challenges a statute's constitutionality, we begin with the presumption that the statute is constitutional." *State ex rel. Ohio Civ. Serv. Emps. Assn. v. State,* 2016-Ohio-478, ¶ 13.

### 2. Legal Analysis

**{¶93}** The trial court found that the definition of "wild boar "or "feral swine" in R.C. 1531.01(HHH) was unconstitutionally broad and vague because it included all pigs, hogs, and swine. The General Assembly made substantive amendments to that definition in June 2025, immediately after the trial court's decision issued. Thus, the June 2025 version of R.C. 1531.01(HHH) was not part of the record below, nor was there testimony or analysis of it. We will not review the newly amended definition for the first time on appeal. However, we do find that the amendments were substantive and would require a new constitutional analysis of R.C. 1531.01(HHH) at the trial court level. Therefore, for purposes of our review, we will not consider the trial court's analysis of R.C. 1531.01(HHH).

**{¶94}** The trial court also found H.B. 503 "void for vagueness, and therefore violates Plaintiffs' rights to due process." "Plaintiffs are unable to act without engaging in criminal activity: they cannot own, kill, transport, feed, or fail to feed the members of the family Suidae that they own, without committing misdemeanor or felony criminal acts."

**{¶95}** The trial court found that the provisions of H.B. 503 violate the Ohio Constitution because "they would constitute an unjust and uncompensated taking."

**{¶96}** Finally, the trial court found that H.B. 503 failed to meet rational basis review. The trial court agreed that feral pigs provide no benefit, but there was no "rational basis connecting the owning, killing, feeding, transporting, or failing to feed any member of the family Suidae with the elimination of feral pigs."

a. Vagueness and Due Process

**{¶97}** "It is well established that all legislative enactments must be afforded a strong presumption of constitutionality." *State v. Collier*, 62 Ohio St.3d 267, 269 (1991). "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'" *Johnson v. United States*, 576 U.S. 591, 595 (2015).

> Under the Due Process Clauses of the Fourteenth and Fifth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution, any statute which " 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute' " is void for vagueness. More recently, the United States Supreme Court has stated that " * * * the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Similarly, this court has stated that " ' * * * [t]he crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue.' "

> Three "values" rationales are advanced to support the "void for vagueness" doctrine. These values are first, to provide fair warning to the ordinary citizen so behavior may comport with the dictates of the statute; second, to preclude arbitrary, capricious and generally discriminatory enforcement by officials given too much authority and too few constraints; and third, to ensure that fundamental constitutionally protected freedoms are not unreasonably impinged or inhibited. (Citations omitted.)

*State v. Tanner,* 15 Ohio St.3d 1, 3 (1984). "The void-for-vagueness doctrine ensures that individuals can ascertain what the law requires of them." *State v. Williams*, 88 Ohio St.3d 513, 532 (2000).

**{¶98}** We agree with the trial court's analysis and find that the provisions in R.C. 1533.731 and R.C. 1533.75 fail to give persons of ordinary intelligence fair

notice that their contemplated conduct is forbidden. Richter and Shawnee Ridge cannot ascertain what the law requires of them so that they can avoid engaging in criminal conduct. The crimes here are not expressed such that the ordinary persons can intelligently choose, in advance of taking action, what course is lawful for them to pursue.

**{¶99}** On March 19, 2025, Richter and Shawnee Ridge could lawfully operate a wild animal hunting preserve that included wild boar among their business inventory. They could possess and feed the animals and hunt, kill, and profit from the hunting of the animals. On March 20, 2025, they instantly, and without taking any action, became criminals as approximately 50 percent of their business inventory was declared unlawful for them to both possess or dispossess. They could not possess, feed, not feed, hunt, kill, transport, or profit from the hunting or killing of the wild boar. Half of Richter and Shawnee Ridge's business operations went from lawful to criminal overnight. Because of the restrictions on all actions involving the animals, it was impossible for them to determine how to intelligently choose, in advance of taking any action, what course was lawful for them to pursue.

**{¶100}** The State argues that the provisions are not vague because it is clear: there is nothing that Richter and Shawnee Ridge can do to avoid criminal activity. However, this argument brazenly disregards the values that support the vagueness doctrine. Ordinary citizens are to be given fair warning so that their behavior might comport with the statute. They must be able to intelligently choose what course is lawful.

{¶101}     The State also argues that opportunities for compliance with H.B. 503 "are plentiful." First, the State argues Shawnee Ridge and Richter had from December 2024 to March 2025 to dispossess themselves of their wild boar inventory "by transporting them out of state or hunting them on the preserve." First, they presented no evidence at the hearing that either of these two "opportunities" were viable options. Transporting them out of state and then what? Releasing them in a neighboring state to become feral? The State gives no guidance. And, the State submitted no evidence that it would be possible for Shawnee Ridge to cull its entire inventory of wild boar in the three-month period from December 19, 2024 and March 20, 2025.

{¶102}     H.B. 503 is void for vagueness because "it fails to give the ordinary citizen adequate notice of what is forbidden *and what is permitted*." (Emphasis added.) *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999). It is vague not in the sense that it imprecisely distinguishes between permissible and impermissible conduct, but because no standard of permissible conduct is specified at all. *Id.*

{¶103}     Last, the State argues that ODNR planned to exercise enforcement discretion and had planned to inform wild animal hunting preserves by letter on March 20, 2025 that it would not enforce H.B. 503 until June 1, 2025, which would have given Richter and Shawnee Ridge both notice of the law and an arbitrarily determined two additional months to cull or transport their inventory out of state. However, H.B. 503 contains no provision that suspends the enforcement of the criminal penalties. ODNR has arbitrarily determined this. County sheriffs and

other state law enforcement officials could enforce them as soon as they became effective on March 20, 2025. ODNR provided no evidence or rationale supporting a June 1, 2025 enforcement date.  Its decision to arbitrarily refrain from enforcing H.B. 503 is a tacit acknowledgment that H.B. 503 fails to provide fair notice and prevent arbitrary enforcement.

**{¶104}**      We find the trial court did not err when it found that Richter and Shawnee Ridge had proven beyond a reasonable doubt that H.B. 503 violated Due Process because it was unconstitutionally vague.

b. Unconstitutional Taking

**{¶105}**      First, the State contends that the procedural posture of this case is wrong. It argues that Richter and Shawnee Ridge should have brought a mandamus action, not a declaratory judgment and injunction action. We disagree. A mandamus action is a procedure to compel appropriation proceedings.  A declaratory judgment action under R.C. 2721.03 is the proper procedure for a person to have determined the validity of a statute and challenge the constitutionality of it. *E.g., Ohioans for Fair Representation v. Taft,* 76 Ohio St.3d 180 (1993); R.C. 2721.12. Additionally, a mandamus action to compel appropriation proceedings and an action for declaratory and injunctive relief are not mutually exclusive proceedings. *State ex rel. Gilmour Realty, Inc. v. City of Mayfield Heights*, 2008-Ohio-318 (a developer could bring both (1) an action for declaratory judgment and injunction alleging that a rezoning ordinance constituted an unlawful taking and (2) a mandamus action to compel the city to commence appropriation proceedings).

{¶106}       Next the State contends that Richter and Shawnee Ridge's hogs are dangerous wild animals over which the State has the power to regulate, citing *Wilkins v. Daniels*, 913 F.Supp.2d 517 (2012) (analyzing the Ohio Dangerous Wild Animals and Restricted Snakes Act). However, the State made no claims in the proceeding below that Richter and Shawnee Ridge's hogs were governed by the Ohio Dangerous Wild Animals and Restricted Snakes Act and thus have waived any arguments related thereto.

{¶107}       Moreover, in *Wilkins*, the plaintiffs argued that the law that required them to microchip their animals was a "permanent physical invasion" of their property and amounted to a taking. The district court found that the plaintiffs had a cognizable property interest in the ownership of dangerous wild animals:  a "limited or qualified property right exists in connection with the ownership of dangerous wild animals" *Id*. at 541. But the microchip requirement was "minimally invasive to the animal" and less invasive than a spay and neutering requirement which had previously been held not to effect a taking. *Id.* at 542. Therefore, the court held that the microchip requirement did not constitute a taking. Unlike H.B. 503, which strictly outlaws without exception the possession of wild boar, the Ohio Dangerous Wild Animals and Restricted Snake Act allowed the plaintiffs to maintain ownership and possession of their animals if they registered and microchipped the animals, obtained proper permits, installed certain fencing, and followed the breeding and selling restrictions. The holding in *Wilkin* lends support to the trial court's finding that H.B. 503 effected a taking without compensation. H.B. 503 does more than impose a layer of regulatory requirements on Richter and

Shawnee Ridge's hogs, it requires the immediate and complete dispossession of them. *See Michigan Animal Farmers Assoc. v. Dept of National Resources and Environment,* 2012 WL 676386 (Mich.App. Mar 1, 2012).

{¶108}    In *Michigan Animal Farmers*, the court held that it was within Michigan DNRE's authority to amend the Invasive Species Order (ISO) to add certain swine breeds to it and to develop a phased compliance protocol for its implementation. The agency amended the ISO in December 2010 and then allowed for a 15-month phase-in period through March 31, 2012 "to allow 'owners of shooting and breeding facilities' an opportunity 'to cease possession of a such swine before determinations of noncompliance will be rendered.' " *Id* at * 7. There was also a procedure for a compensation claim in the Michigan Court of Claims. The court held that this did not constitute a taking because "owners of prohibited swine will not immediately lose their property, and any property that is lost will be subject to a potential claim for government compensation in the Court of Claims." *Id.* Here, H.B. 503 does constitute a taking because it does require the immediate loss of property and provides no system for compensation.

{¶109}    We find the trial court did not err when it found that Richter and Shawnee Ridge had proven beyond a reasonable doubt that H.B. 503 constituted an unconstitutional taking of their property.

c. The Rational Basis Test

{¶110}    The State and Richter and Shawnee Ridge disagree on how the June 2025 amendments to R.C. 1531.01(HHH) impact the trial court's finding that H.B. 503 does not meet rational basis review. The State argues that the trial

court's rational basis holding was based on its finding that "wild boar" or "feral swine" encompasses every pig in Ohio. Therefore, the amendments moot that finding. Richter and Shawnee Ridge argue both that it refers to "everything pig-related in Ohio" and that it also refers to their pigs.

{¶111}     In discussing the rational basis test, the trial court's decision appears to rely on its interpretation that R.C. 1531.01(HHH) definition includes all pigs. It states:

> In addition, the Court finds that the specific amendments and additions to Chapter 15 in H.B. 503 do not meet rational basis review. Feral pigs provide no benefit, but the Court cannot find that there is a rational basis connecting the prohibition on owning, killing, feeding, transporting or failing to feed *any member of the family Suidae* with the elimination of feral pigs. (Emphasis added.)

The use of the phrase "any member of the family Suidae" means all pigs because it is undisputed by the parties that Suidae means pigs. Therefore, we read the trial court's finding as applying the rationale basis test to H.B. 503's ban on all pigs in the state. The trial court's remarks from the bench at the conclusion of the hearing also appear to support our determination that the trial court was using the definition of the wild boar to mean all pigs. Excerpts from that portion of the trial court's remarks include:

> And then the rational basis test. Ask whether the method or means is rational in its rawest form. And the court cannot find, again going back to its belief, that while extremely well-intended law, no hesitation or reservation . . . . Again, well-intended law, but just ill-conceived terminology, ambiguous definitions. . . . But I don't think, with time for a brief, that it can be the family Suidae, including . . . .You don't have to be a wordsmith.

**{¶112}** Because we find that the trial court applied the rational basis test to H.B. 503 as applicable to all pigs in the state and that definition has since been amended, we find this portion of the trial court's findings moot. However, we find that the trial court's vagueness and takings findings were supported by proof beyond a reasonable doubt. These two grounds are sufficient to affirm the trial court's grant of a permanent injunction. The trial court did not abuse its discretion when it granted a permanent injunction of the contested sections of H.B. 503.

**{¶113}** We overrule the State's third assignment error.

## IV.  CONCLUSION

**{¶114}** We overrule the State's assignments of error and affirm the trial court's judgment. We remand the cause for a nunc pro tunc entry to state the standard of proof of beyond a reasonable doubt for the constitutional findings the trial court issued.


**JUDGMENT AFFIRMED AND CAUSE REMANDED FOR NUNC PRO TUNC ENTRY.**

**JUDGMENT ENTRY**

It is ordered that the JUDGMENT AFFIRMED AND CAUSE REMANDED FOR NUNC PRO TUNC ENTRY.  Costs to be paid by appellants.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Adams County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.


For the Court,


_____
Michael D. Hess
Judge


**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**